IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

GREGORY C.[1],                                      No. 3:18-cv-00971-HZ

             Plaintiff,

    v.

COMMISSIONER, SOCIAL                         OPINION & ORDER
SECURITY ADMINISTRATION,

             Defendant.

John E. Haapala
401 E. 10th Avenue
Eugene, Oregon 97401

       Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case.  Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

1 - OPINION & ORDER

Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2936

Erin F. Highland
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

     Attorney for Defendant

HERNANDEZ, District Judge:

     Plaintiff Gregory C. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). I reverse the Commissioner's decision and remand for benefits beginning November 1, 2010.

## PROCEDURAL BACKGROUND

     Plaintiff applied for DIB on December 20, 2010, alleging an onset date of November 28, 2006. Tr. 145-46. His application was denied initially and on reconsideration. Tr. 62-73, 86-69 (Initial); Tr. 74-83, 943-95 (Recon.). On March 15, 2013, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 30-61. On May 1, 2013, the ALJ found Plaintiff not disabled. Tr. 13-29. After the Appeals Council denied review, Tr. 1-6, Plaintiff appealed to this Court. In an April 20, 2015 Opinion & Order, Judge Marsh reversed the ALJ's decision and remanded the case back to the agency. Tr. 397-429.

     On remand, Plaintiff appeared for a second hearing before the same ALJ on August 3, 2016. Tr. 240-69. On March 29, 2017, the ALJ again found Plaintiff not disabled. Tr. 320-39.

Plaintiff filed an untimely complaint in this Court, and the case was dismissed without prejudice. *Gregory C. v. Comm'r*, No. 3:17-cv-00729-BR, Judgment of Dismissal Without Prejudice (D. Or. Apr. 19, 2018). Plaintiff represents, and Defendant does not dispute, that on August 24, 2018, the Appeals Council granted Plaintiff additional time to commence a civil action. Pl.'s Brief 2, ECF 19.[2]

## FACTUAL BACKGROUND

Plaintiff alleges disability based on chronic pain caused by fibromyalgia. Tr. 169. At the time of the August 2016 hearing, he was fifty-seven years old. Tr. 145 (showing date of birth). He completed eleventh grade and has past relevant work experience as an auto mechanic. Tr. 170, 331, 360-61.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in

---

[2] Plaintiff does not provide an Administrative Record cite for this Appeals Council's extension. But, given that Defendant has not challenged the assertion and defends the ALJ's decision on the merits, I accept that the Complaint in this case is timely.

"substantial gainful activity."  If so, the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  *Yucker*t, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can perform past relevant work, the claimant is not disabled.  If the claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

In the March 29, 2017 Decision, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 28, 2006, through his date of

last insured of December 31, 2011.  Tr. 325-26.  Next, at steps two and three, the ALJ

determined that Plaintiff has severe impairments of fibromyalgia, degenerative disc disease, and

osteoarthritis, but that these impairments did not meet or equal, either singly or in combination, a

listed impairment.  Tr. 326.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work as

defined in 20 C.F.R. § 404.1567(b) but with the following additional limitations: (1) he can sit up

to eight hours in an eight-hour workday and he can stand and/or walk up to two hours in an eight-

hour workday; (2) when seated, he can stand for five minutes every hour without the need to

leave the workstation; (3) he can occasionally climb ramps and stairs; (4) he cannot climb

ladders, ropes, or scaffolds; (6) he can occasionally stoop, kneel, crouch, and crawl; (7) he can

occasionally reach overhead bilaterally; and (8) he must avoid exposure to hazards such as

unprotected heights and dangerous machinery.  *Id.*

With this RFC, the ALJ determined that Plaintiff is unable to perform any of his past

relevant work.  Tr. 331.  However, at step five, the ALJ determined that Plaintiff is able to

perform jobs that exist in significant numbers in the economy such as small products assembler,

laundry folder, and price marker.  Tr. 332.  Thus, the ALJ determined that Plaintiff is not

disabled.  Tr. 332-33.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the

Commissioner's findings "are based on legal error or are not supported by substantial evidence in

the record as a whole."  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation

marks omitted).  "Substantial evidence means more than a mere scintilla but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) improperly finding his subjective symptom testimony not credible; (2) improperly rejecting the opinion of his treating physician Howard Gandler, M.D.; and (3) improperly relying on vocational expert (VE) testimony when proper application of the Medical-Vocational Guidelines ("the Grids") directs a finding of disabled.

I. Plaintiff's Credibility

The ALJ is responsible for determining credibility. *See Vasquez*, 572 F.3d at 591. Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility

finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*:

In evaluating the claimant's testimony, the ALJ may use ordinary techniques of
credibility evaluation.  For instance, the ALJ may consider inconsistencies either
in the claimant's testimony or between the testimony and the claimant's conduct,

unexplained or inadequately explained failure to seek treatment or to follow a
prescribed course of treatment, and whether the claimant engages in daily
activities inconsistent with the alleged symptoms[.] While a claimant need not
vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit
a claimant's testimony when the claimant reports participation in everyday
activities indicating capacities that are transferable to a work setting[.] Even
where those activities suggest some difficulty functioning, they may be grounds
for discrediting the claimant's testimony to the extent that they contradict claims
of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

In a February 2011 Adult Function Report, Plaintiff stated he could not work because of

his pain and fatigue. Tr. 184. He reported that he could not physically work because if he

worked for an hour, he experienced too much pain and felt too tired to go on. *Id.* His daily

routine at that time consisted of getting up and having coffee, walking the dog for thirty minutes,

eating breakfast, watching television, cleaning a little such as sweeping or vacuuming, walking

the dog for another thirty minutes, eating dinner, watching more television, and going to bed. Tr.

185.

He stated that he prepared simple meals such as sandwiches or frozen dinners, once or

twice each day. Tr. 186. He could do the laundry, sweep the floor, and vacuum. Tr. 187. He

did these chores a couple of times each week. *Id.* Yard work was too physical for him as it

requires too much bending, lifting, and walking. *Id.* He drove a car. *Id.* A couple of times each

week he shopped in stores for food and supplies. *Id.* He watched television, read, and enjoyed

time with his dog. Tr. 188. Although walking his dog was his favorite thing to do, he could not

do it as much as he desired. *Id.* He could no longer kayak, roller skate, or ride a dirt bike. *Id.*

He talked on the phone. *Id.*

Plaintiff stated that his illness affected his ability to lift, squat, bend, stand, reach, walk,

sit, kneel, climb stairs, complete tasks, and concentrate. Tr. 189. Any physical activity left him sore and tired, as did sitting more than thirty minutes. *Id.* Although he said that pain made it hard for him to concentrate and that completing tasks was a challenge, he also said that he could pay attention for a "normal" amount of time and he finished what he started. *Id.* He stated that he could walk 1/8 of a mile before needing to stop and rest and that he could then resume walking after five to ten minutes. *Id.* Stress increased his pain. Tr. 190. He also stated that his pain interrupted his sleep. Tr. 185.

In a February 2011 Pain & Fatigue Questionnaire, Plaintiff stated that his pain consisted of aching and stiffness in all joints and muscles and that he experienced it "all day every day all night." Tr. 192. Any physical activity caused the pain, including walking, cleaning, driving, and lifting. *Id.* Weather changes and stress also made the pain worse. *Id.* Rest and pain medication improved the pain. *Id.* He required an hour nap two to three times per day because of his fatigue. *Id.* He rested between activities such as walking his dog, driving, and housework. *Id.* He could be up and active for four to six hours before needing to rest. *Id.*

At the 2016 hearing, both the ALJ and Plaintiff's counsel emphasized that Plaintiff's testimony must relate to the period of time before Plaintiff's last insured date of December 31, 2011. T.r 343, 345, 349-50. Plaintiff described his symptoms as of that time. Tr. 347. He could not stand for very long. *Id.* And, he could sit only about an hour at a time, but if he got up or laid down for awhile, he could sit again. *Id.* He rejected the idea that he could combine sitting and standing to get through an eight-hour work day because he spent most of his time lying down. *Id.*

Plaintiff's counsel asked him to explain what he meant in his 2011 Adult Function Report

when he stated that he could be active for four to six hours before needing to rest.  Tr. 347-48.

Plaintiff first said that he was not really sure what that meant.  Tr. 347.  Then, he indicated that

the four to six hours of activity he referred to in the Adult Function Report was spread out over

the entire time from when he woke up to when he went to bed; it was not meant to suggest he

could be continuously active for those several hours within an eight-hour work day.  Tr. 347-48.

Plaintiff described flares in his symptoms, stating that he could be "pretty good for a

couple of days," feel great and then do things, but then, "you're down for all of a sudden a week

or something like that."  Tr. 348.  Plaintiff described the tension between the need to exercise, as

he understood his physician's instructions, and the fact that activity sometimes caused his

symptoms to flare.  Tr. 349-51.  Thus, he walked his dog even though sometimes he hurt the

whole time.  Tr. 350.  In 2011, he would walk his dog one mile on a good day if he was not

experiencing a flare.  Tr. 351.  He walked the dog four or five days each week.  Tr. 352.

Generally, when he experienced a flare, it would last a week or longer, "sometimes the whole

month."  Tr. 353.  In 2010, flares occurred once or twice per month.  *Id.*  When experiencing a

flare, he stated he was housebound.  Tr. 354.  He would not leave the couch.  Tr. 356.  The pain

killed his appetite.  Tr. 357.  He would try to walk during a flare but he indicated that one could

observe by watching him that he was really hurting.  Tr. 354 ("if you didn't even know me, you

know, walking like I'm 80 years old and not 50 as I was back then.").

Plaintiff testified that in 2010 he experienced almost constant pain in his spine and upper

neck.  Tr. 353.  Nonetheless, during the relevant period, Plaintiff also worked as a locksmith.  Tr.

348-49.  But, the most he worked was ten hours in a week.  A more typical week consisted of

only a couple of hours.  *Id.*  He noted that if he did two or three locksmith jobs in a row, it could

cause him to be "down for a week." Tr. 349.

In the first ALJ decision issued in 2013, the ALJ found Plaintiff's testimony regarding the intensity, persistence, and functionally limiting effects of his pain not entirely credible. Tr. 19. In his April 2015 Opinion, Judge Marsh partially affirmed the ALJ on this issue. Tr. 407-16. Judge Marsh explained that of the five reasons the ALJ gave for rejecting Plaintiff's subjective testimony, two were supported by substantial evidence but three were not. *Id.* He agreed with the ALJ that records showing that Plaintiff continued to kayak and go rafting in 2006 were inconsistent with his alleged November 2006 onset date. Tr. 409-10. He also agreed with the ALJ that the lack of any treatment records until June 2008 was a valid basis for concluding that any symptoms Plaintiff had before that time were not disabling. Tr. 410-12.

Judge Marsh disagreed with the ALJ, however, that Plaintiff's stated activities of daily living after June 2008 of vacuuming, dusting, and doing laundry exceeded his alleged limitations. Tr. 412-13. Judge Marsh noted Plaintiff's testimony that he walked his dog for fifteen minutes, sat to rest, then walked again. Tr. 412. He also noted Plaintiff's testimony that fatigue and pain prevented him from performing prolonged activities. *Id.* He concluded that the evidence in the record failed to show that the limited activities Plaintiff engaged in either comprised a substantial portion of his day or were transferable to a work setting. Tr. 412-13. Thus, he concluded that the ALJ erred in rejecting Plaintiff's testimony on this basis. *Id.*

Next, Judge Marsh discussed the ALJ's finding that Plaintiff's testimony was not credible because he worked as a locksmith after his alleged onset date. Tr. 413. The ALJ found this work inconsistent with Plaintiff's testimony at the March 2013 hearing that the locksmith work was just a hobby. Judge Marsh noted that in April 2010, Plaintiff reported to his physician that he

worked seven to ten jobs each week, but by February 2011, his pain made him reduce the number of locksmith jobs he could perform. *Id.* The evidence indicated Plaintiff worked about twenty hours per month from 2007 to 2009. *Id.* Judge Marsh found that this level of activity was not inconsistent with Plaintiff's allegations and that performing the locksmith work on average five hours per week could be considered by some to be a hobby. *Id.* Judge Marsh noted that Plaintiff's allegations of increasing pain and fatigue were consistent with his allegations that he stopped working as an auto mechanic and then had to reduce his hours as a locksmith. Tr. 413-14. Thus, Judge Marsh concluded that the "ALJ erred in discounting plaintiff's credibility based on plaintiff's ability to work brief periods as a locksmith." Tr. 414.

Finally, Judge Marsh discussed the ALJ's rejecting Plaintiff's testimony because his symptoms were inconsistent with the medical record. Tr. 414-15. As described by Judge Marsh, the ALJ noted that Plaintiff had reported constant pain and fatigue in May 2011 to examining physician Dr. Ogisu. Tr. 414. But, upon physical examination, Dr. Ogisu found relatively normal findings. Tr. 415. Still, Dr. Ogisu diagnosed fibromyalgia with sixteen of eighteen tender points positive, and asymptomatic osteoarthritis of the hands. *Id.* As Judge Marsh explained, the ALJ found that plaintiff's ability to perform some household chores along with the medical evidence from Dr. Ogisu, undermined Plaintiff's allegations of total disability. Tr. 415.

Judge Marsh examined "the record carefully" and could not conclude that Dr. Ogisu's medical evidence provided clear and convincing support for the adverse credibility determination. Tr. 415. Judge Marsh acknowledged that Plaintiff alleged he became fatigued with activities performed for longer than thirty minutes. *Id.* But, Dr. Ogisu's opinion did not reflect the duration of his examination or whether Plaintiff could perform any of the examination

activities repeatedly without pain or fatigue. *Id.* And, Judge Marsh noted, Dr. Ogisu indicated that Plaintiff reported moderate pain. *Id.* As a result, Judge Marsh concluded that the inconsistency between Plaintiff's allegations and Dr. Ogisu's report was not a clear and convincing reason to discount Plaintiff's testimony. *Id.*

In summarizing the credibility issue, Judge Marsh recognized that because some of the ALJ's reasons for discounting Plaintiff's testimony were valid, he could uphold the overall negative credibility finding. Tr. 415. But, he explained, the reasons given by the ALJ that were actually supported in the record negated disabling level symptoms only between 2006 and 2008. Tr. 416. Those reasons were not inconsistent with other evidence that showed Plaintiff's fibromyalgia to be deteriorating. Tr. 416. Thus, overall, the ALJ's reasoning fell "short of clear and convincing" and the ALJ erred. *Id.*

In the May 2017 ALJ decision presently under review, issued after the remand from Judge Marsh, the ALJ summarized Plaintiff's testimony from the first hearing in March 2013. Tr. 327. She noted that his testimony at that time referred to muscle and joint pain in his knees, elbows, shoulders, neck, hips, and back. *Id.* She cited to his earlier testimony that five days per week, Plaintiff walked his dog for about fifteen minutes, stopped to rest for thirty minutes, then walked back home for fifteen minutes. *Id.* She noted his previous statements that he took Trazadone for sleep, and while Tramadol helped his symptoms somewhat, it also made him groggy. She noted his problems concentrating and arthritis in a couple of fingers. *Id.*

The ALJ then summarized Plaintiff's testimony from the 2016 hearing at which he reported that in 2011, he could not sit, stand, or walk for eight hours in an eight-hour work day, that most of his day was spent lying down, and then during his entire waking day, he could be up

only for four to six hours. *Id.* She described his testimony about flares, his inability to work even part time, and that the flares occurred once or twice a month and could last a week or longer. *Id.* She noted his testimony that during a flare, he would be housebound. *Id.* She described his walking the dog four or five times per week, up to a mile, if he was not experiencing a flare. *Id.*

She also noted his work as a locksmith, putting in ten hours a week at most. *Id.* She cited to his April 2010 report that at that time, he worked seven to ten locksmith jobs most weeks. Tr. 329. She cited to his February 2011 report indicating that his work was down to about one day per week, he was not advertising, and did work only for his best customers. *Id.* The ALJ further noted that Plaintiff reported being able to sweep, do dishes, do laundry, and walk his dog. *Id.* He could also shop twice per week and drive. *Id.*

The ALJ then cited the correct two-step credibility analysis. Tr. 328. She determined that Plaintiff's impairments could reasonably be expected to cause some of his symptoms but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. *Id.* As she did in her previous decision, the ALJ relied on Plaintiff's recreational sports of kayaking and rafting in 2006 and the lack of treatment records until June 2008 as undermining his allegations of debilitating symptoms. Tr. 328. Next, she noted that in June 2008, Plaintiff's treating physician Dr. Gandler noted that while Plaintiff had positive fibromyalgia points, he did not meet the tender point criteria for a fibromyalgia diagnosis. *Id.* Then, in August 2009, Plaintiff reported to Dr. Gandler that Tramadol worked reasonably well most of the time in addressing his symptoms. *Id.* By August 2013, Dr. Gandler noted that Plaintiff had met the tender point criteria for a fibromyalgia diagnosis. *Id.* The ALJ also noted

that although very limited, Plaintiff continued to do some work after his alleged onset date. *Id.*

Summarizing, the ALJ wrote:

> Combined with his recreational activities and independent activities of daily living, the undersigned finds the claimant capable of work at a modified light level. To clarify, it is not the claimant's work, activities of daily living or recreational activities separately, but the combination of all three that persuades the undersigned the claimant remains capable of modified light exertional work.

Tr. 328-29. She further stated that the "medical record and his ability to perform household tasks, shop, drive, and walk his dog suggest a capacity for lighter types of tasks especially with additional reduced walking/standing requirements." Tr. 329.

Plaintiff argues that the ALJ erred in her credibility determination. He notes that the ALJ was careful to clarify in this recent decision that it was the combination of Plaintiff's recreational activities, his locksmith work, and his activities of daily living that undermined his allegations. But, he argues that Judge Marsh already concluded that Plaintiff's activities of daily living after June 2008 and his work as a locksmith, considered singularly or in combination, did not amount to clear and convincing reasons to reject his testimony.

In response, Defendant argues that the ALJ's reasons for rejecting Plaintiff's testimony are legally sufficient. Defendant repeats the reasons asserted by the ALJ. Def.'s Br. 6-8 (noting that the ALJ relied on the lack of treatment between February 2007 and June 2008, the performance of recreational activities inconsistent with disabling-level symptoms, Plaintiff's ability to do some work after his alleged onset date, Plaintiff's activities of daily living, and treatment records showing only mild symptoms in 2008 and symptoms controlled with medication in 2009), ECF 20. Defendant cites law holding that each of these reasons, if supported by substantial evidence in the record, have been found to be clear and convincing reasons for rejecting a claimant's

subjective symptom testimony. *Id.*

Defendant notes that the ALJ relied on the combination of Plaintiff's abilities to do some work, along with his recreational activities and independent activities of daily living. Defendant cites Plaintiff's work of twenty hours per month as a locksmith and his report of doing several locksmith jobs per week along with his ability to walk his dog, drive, shop, and perform household chores. *Id.* at 8. According to Defendant, these are sufficient reasons to reject Plaintiff's testimony.

I disagree with Defendant. It is clear from reading his opinion that Judge Marsh agreed with the ALJ that until June 2008, the evidence in the record was inconsistent with Plaintiff's allegations of disabling symptoms. Notably, in 2006 Plaintiff kayaked and rafted and until June 2008, he had no treatment records. But, it is just as clear that for the period of time after that date, Judge Marsh *rejected* the contention that Plaintiff's locksmith work and his activities of daily living were inconsistent with his allegations. Given this, and given that the relevant evidence in the record regarding Plaintiff's work, recreational activities, and activities of daily living for the period before December 31, 2011 did not change in any significant way upon remand, it is unclear to me why the ALJ returned to the same reasons which were already found to be legally insufficient.

That the ALJ now relies on a combination theory to support her decision does not save the finding from error. First, as is clear from the portions of Judge Marsh's decision affirming the ALJ's prior negative credibility determination, the only time Plaintiff engaged in inconsistent recreational activities of kayaking and rafting was in 2006. In fact, in his February 2011 Adult Function Report, Plaintiff noted that he could no longer engage in kayaking and similar activities.

Tr. 188. Thus, those activities, considered singularly or in combination with other activities, provide no basis for rejecting Plaintiff's testimony regarding the time period *after* June 2008.

Second, although Judge Marsh considered the locksmith work separately from the activities of daily living and did not expressly consider them in combination, even when so considered they do not contradict Plaintiff's subjective testimony. The ALJ fails to sufficiently explain how the limited locksmith work, especially beginning in late 2010 or early 2011 when Plaintiff told Dr. Gandler that his increased pain and fatigue reduced the number of locksmith jobs he could perform, along with limited housework of a couple of times per week plus dog walking several times per week, comprise a substantial portion of Plaintiff's day or are transferable to a work setting. Simply stating that the combination shows he can perform modified light exertional work does not, without more, amount to a clear and convincing reason. Plaintiff's testimony is that walking the dog causes pain, requiring him to rest, but he persists in doing it because he has been told he must exercise. Nothing about his activities, alone or in combination, undermines his testimony that he can engage in some activity from the time he wakes up until he goes to bed, meaning throughout a period longer than eight hours, but that he still rests in between and limits himself. Nothing about his activities, alone or in combination, undermines his testimony that he has flare ups if he does too much, requiring him to rest even more.

Given (1) Judge Marsh's previous conclusions, (2) the fact that the relevant evidence in the record remains substantially the same as the evidence Judge Marsh considered, and (3) that the ALJ failed to sufficiently explain how the combination of limited work and daily activities which independently do not undermine Plaintiff's testimony, is at odds with Plaintiff's testimony,

the ALJ's credibility finding is not based on clear and convincing reasons supported by substantial evidence in the record.  Therefore, the ALJ erred.

II.  Dr. Gandler

Social security law recognizes three types of physicians:  (1) treating, (2) examining, and (3) nonexamining.  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant.  *Id.*; 20 C.F.R. § 404.1527(c)(1)-(2).  And, more weight is given to an examining physician than to a nonexamining physician.  *Garrison*, 759 F.3d at 1012.

If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight.  *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons supported by substantial evidence in the record.  *Ghanim*, 763 F.3d at 1160-61.

Even if the treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" which are supported by substantial evidence in the record.  *Id.* at 1161; *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  And, when a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. § 404.1527(c)(2)-(6); *Ghanim*, 763 F.3d

at 1161; *Orn*, 495 F.3d at 632-33.

Since 2008, Dr. Gandler has been Plaintiff's treating rheumatologist. In June 2008, Dr. Gandler provided a detailed description of Plaintiff's medical condition. Tr. 251-52. He summarized Plaintiff's complaints and then noted his findings upon physical examination. He found positive fibromyalgia points at the trapezius, scapular, gluteal, anterior cervical, and lateral elbow. Tr. 252. Dr. Gandler wrote that while Plaintiff's pain symptoms were consistent with fibromyalgia, Plaintiff did not meet the tender point criteria to support the diagnosis. *Id.* But, Dr. Gandler explained, Plaintiff's "problem is almost certainly in the same pathophysiological spectrum as fibromyalgia." *Id.* Dr. Gandler opined that Plaintiff may also have osteoarthritis in the neck and/or knees. *Id.* He noted Plaintiff's chronic pain and poor sleep. *Id.* He indicated that a water exercise program in an indoor heated pool would be beneficial. *Id.*

In a September 30, 2009 letter, Dr. Gandler wrote that Plaintiff's chronic pain "limits his ability to work and to engage in normal non[-]work activities." Tr. 241. He observed that Plaintiff's dog was therapeutic in a sense by acting as an antidepressant and also because the need to care for the dog "provides a 'push' to get up and move at least some when his pain would make him want to just lie around." *Id.* Almost two years later, on August 29, 2011, Dr. Gandler completed a "Spinal Impairment Questionnaire" accompanied by a four-page narrative opinion. Tr. 273-84. There, he noted Plaintiff's diagnosis as fibromyalgia, his prognosis as poor, that he began treating Plaintiff in June 2008, and that he saw him a few times each year. Tr. 273. Dr. Gandler wrote that Plaintiff's pain and fatigue were "bad enough to be disabling." Tr. 280. He noted that Plaintiff now had sixteen of eighteen positive tender points. *Id.* Plaintiff's primary symptoms were noted to be severe pain, fatigue, poor sleep, difficulty concentrating in part

because of pain and fatigue, and nausea secondary to pain. *Id.* Typical of fibromyalgia, Dr. Gandler noted that Plaintiff had "aching in all affected areas." Tr. 281. Plaintiff reported worsening pain with activity and that the pain was not fully relieved by medication. *Id.* At that time, Plaintiff was taking Tramadol four or five times per day. Tr. 272. Other medications had caused unpleasant side effects. *Id.* Plaintiff was uninsured and could not afford other medications designed to specifically treat fibromyalgia. *Id.*

Dr. Gandler further assessed Plaintiff's functional limitations. Tr. 281-83. He opined that Plaintiff could sit, stand, and walk for less than one hour and is "incapable of performing any useful work"; he needs to lie down during the day and change positions frequently; he can lift and carry five pounds frequently; he cannot push or pull; he should avoid wetness, humidity, temperature changes, walking on stairs, inclines, bending and stooping; and he would be absent from work more than three days per month. *Id.* Dr. Gandler also opined that Plaintiff has had all of these symptoms and limitations to this degree since November 2010, and to a lesser degree since 2005, but that the symptoms had progressively deteriorated. Tr. 285.

In a January 25, 2013 letter, Dr. Gandler provided an update regarding Plaintiff's condition which largely repeated the same restrictions described in his August 29, 2011 letter. Tr. 292-94. He noted that there was "no activity that he could perform on a real work schedule[.]" Tr. 294. He again opined that Plaintiff's symptoms and limitations had been present since at least November 2010. *Id.* In a February 7, 2013 narrative report, Dr. Gandler again repeated much of what was in his August 29, 2011 letter. Tr. 296-300.

In the first ALJ opinion in 2013, the ALJ gave Dr. Gandler's opinions "little weight." Tr. 21. The ALJ discounted the opinions because (1) they were based primarily on Plaintiff's self-

reports; (2) the degree of limitation was not supported by the treatment record; and (3) the limitations were inconsistent with Plaintiff's daily activities. *Id.*

Judge Marsh agreed with the ALJ that some of the limitations Dr. Gandler assessed were not supported by the treatment record. Tr. 421-22. In particular, Judge Marsh noted (1) the August 2009 treatment records stating that Tramadol was working reasonably well aside from two episodes of symptom flare; (2) that treatment records indicated Plaintiff was sleeping better or adequately which was inconsistent with an opinion that he suffered from poor sleep; and (3) that there was no mention in the treatment notes of difficulties with attention or concentration, or administration of any objective testing in those areas, which contradicted Dr. Gandler's opinion that Plaintiff suffered from impairments in concentration and attention. *Id.*

Otherwise, however, Judge Marsh found that the ALJ erred. Judge Marsh explained that because the ALJ had improperly rejected Plaintiff's subjective symptom testimony, the ALJ could not reject Dr. Gandler's opinion because it was based on Plaintiff's self-reports. Tr. 420. And, Judge Marsh concluded that Plaintiff's activities were not inconsistent with Dr. Gandler's assessment. Tr. 422-23. Judge Marsh explained that after June 2008, the record did not indicate that Plaintiff had been engaging in activities of daily living that exceeded Dr. Gandler's limitations. Tr. 422. Although Plaintiff had indicated in 2011 that he could be active for four to six hours before needing to rest, he also reported in that same questionnaire that he needed to take two to three naps per day and had to rest if he walked his dog for thirty minutes. *Id.* Plaintiff also described lying down most of the day, watching television, and resting after fifteen minutes of walking his dog. *Id.* Nothing that Plaintiff described in his function report took longer than thirty minutes to perform. Tr. 422-23. Thus, Judge Marsh concluded that the ALJ

erred in discounting Dr. Gandler's opinion for the reason that it was inconsistent with Plaintiff's daily activities. *Id.*

Even though Judge Marsh concluded that one of the three reasons the ALJ gave for discounting Dr. Gandler's opinion was appropriate, Judge Marsh still concluded that the inconsistencies between Dr. Gandler's treatment notes and his opinions did not, without more, amount to a specific and legitimate reason warranting the rejection of a treating physician's opinion. Tr. 423. Judge Marsh observed that the ALJ discussed the opinion of examining physician Tatsuro Ogisu, M.D., but, the ALJ did not specifically reject Dr. Gandler's opinion based on "Dr. Ogisu's physical one-time examination results." *Id.* Judge Marsh explained that "[g]iven plaintiff's fibromyalgia, the court is unwilling to supplant Dr. Gandler's longitudinal record of treating plaintiff with that of Dr. Ogisu absent a more thorough discussion of the conflicting medical evidence" as well as the relevant factors as established in the regulations and rulings. *Id.* Later, Judge Marsh indicated that upon remand, the ALJ should reconsider Dr. Gandler's opinion and re-contact him if necessary. Tr. 427.

The ALJ did not re-contact Dr. Gandler. In her 2017 opinion, she again gave Dr. Gandler's opinions "little weight." Tr. 330. The ALJ introduced this section of her opinion by stating that she had carefully considered the reports of treating, examining, and non-examining medical sources, including the DDS doctors who provided opinions for the initial and reconsideration determinations. Tr. 329. Repeating exactly what she said in her prior May 2013 opinion, the ALJ summarized Dr. Gandler's August 2011 report. Tr. 330. Still repeating the prior opinion verbatim, the ALJ noted that in January and February 2013, Dr. Gandler opined that Plaintiff's restrictions continued to the same degree. *Id.* Then, still using identical or nearly

identical language to the prior opinion, the ALJ wrote that she rejected Dr. Gandler's opinions

and limitations because they were "based primarily on the claimant's self-reports rather than

observed findings[,]" and they were "not supported by the treatment record of the claimant's daily

activities." *Id.*

This portion of the ALJ's reasoning has already been assessed by Judge Marsh. As he

explained, because the ALJ's credibility determination is in error, the fact that Dr. Gandler's

limitations are based to some extent on Plaintiff's self-reports is not a specific and legitimate

reason for rejecting Dr. Gandler's opinion. Tr. 420 (citing *Tommasetti*, 533 F.3d at 1041 (ALJ

may discount medical opinions that are based to a large extent on a claimant's self-reports that

have been properly discounted as incredible)). Judge Marsh also explained why Plaintiff's daily

activities, at least since June 2008, were not inconsistent with Dr. Gandler's limitations. Tr. 422.

The ALJ cites to no new or additional evidence in support of this finding. Accordingly, based on

Judge Marsh's opinion, Plaintiff's daily activities do not constitute a specific and legitimate

reason to discount Dr. Gandler's assessed limitations.

As to Dr. Gandler's treatment record, the ALJ noted again that there are no mentions of

problems with attention or concentration in Dr. Gandler's treatment records. Tr. 330, 421. Thus,

as Judge Marsh already concluded, Dr. Gandler's opinion that Plaintiff suffers from impairments

in the areas of attention and concentration are not supported by his own records. The ALJ also

stated that although Dr. Gandler[3] noted that Plaintiff has involuntary twitches, there is no

mention of Dr. Gandler himself observing these and no record of Plaintiff consistently

---

[3] Twice, the ALJ referred to a "Dr. Garland." Tr. 330. The Court assumes this is a
reference to Dr. Gandler.

complaining about them.  *Id.*

The ALJ further noted that Dr. Gandler's treatment notes do not comment on Plaintiff appearing fatigued, except to the extent he notes Plaintiff's allegations of such.  Tr. 330, Tr. 421. As noted above, Judge Marsh observed that Dr. Gandler's chart notes indicated that Plaintiff reported sleeping well.  Tr. 421 (citing Tr. 238 (Apr. 2010 chart note); Tr. 244 (Nov. 18, 2008 chart note); Tr. 249 (July 2008 chart note); Tr. 237 (Oct. 2010 chart note)).  Thus, he found that opinions from Dr. Gandler that Plaintiff suffers from poor sleep were not supported by Dr. Gandler's own treatment notes.

A closer look at the record, however, reveals that the treatment records showing Plaintiff sleeping well are all dated before November 2010.  In Dr. Gandler's opinion, that is when Plaintiff's symptoms became severe.  The records after that date note that Plaintiff's sleep had worsened or was poor.  *E.g.*, Tr. 236 (Feb. 2011 chart note stating that Plaintiff's sleep had gotten worse); Tr. 271 (Aug. 2011 chart note stating that Plaintiff's sleep was poor).  Thus, the treatment notes are consistent with the opinions that Plaintiff was fatigued after November 2010.[4]

The ALJ cites to a few additional examples of alleged inconsistences between Dr. Gandler's opinions and his treatment notes, but like the fatigue examples, they all pre-date November 2010, the time when Dr. Gandler opines that Plaintiff's symptoms became severe and disabling.  Tr. 285; *see also* Tr. 427 (Judge Marsh noting that Dr. Gandler opined that Plaintiff's

---

[4]  Additionally, it is unclear to this Court why sleeping well or "pretty good" is inconsistent with fatigue when fatigue can be caused by factors other than poor sleep such as mental strain, physical exertion, disease, or stress.  *See Taber's Cyclopedic Medical Dictionary* 852 (Donald Venes, ed., 21st ed. 2009) (stating that fatigue may be caused by excessive activity; circulatory disturbances; respiratory disturbances; infectious diseases; endocrine disturbances; psychogenic factors such as emotional conflicts, frustration, anxiety, neurosis and boredom; and physical factors such as disability).

symptoms did not become severe under November 2010). The ALJ noted that at "his initial evaluation, Dr. Gandler described the claimant as well nourished, well developed, and in no distress." Tr. 330 (citing Tr. 251). And, the ALJ stated that at that time, Dr. Gandler wrote that Plaintiff had pain "that is bad but not as severe since the claimant switched professions." *Id.* (citing Tr. 251). The ALJ also stated that in August 2009, Dr. Gandler wrote that Tramadol worked reasonably well for Plaintiff except for two flares since Plaintiff's last visit in March 2009. *Id.* (citing Tr. 242).

These examples do not, however, show an inconsistency between Dr. Gandler's opinion and his treatment notes. First, the description of Plaintiff being "well nourished, well developed, and in no distress," was actually reported by Dr. Gandler as "well nourished, well developed male in no distress *at rest.*" Tr. 251 (emphasis added). Second, and more importantly, all of these examples by the ALJ are to records pre-dating November 2010. The first two examples are taken from Dr. Gandler's June 2008 report and the third is from August 2009. Dr. Gandler's opinion regarding Plaintiff's functional limitations was issued in August 2011. Tr. 281-85. There, Dr. Gandler indicated that the assessed limitations had existed to this degree since November 2010 and to a lesser degree before that date. Tr. 285. Thus, any pre-November 2010 treatment record suggesting functional abilities greater than what Dr. Gandler later assessed existed after that date, does not undermine that later assessment. Therefore, as to the treatment records, the ALJ has identified a few isolated instances where Dr. Gandler's treatment records after November 2010 are not entirely consistent with Dr. Gandler's opinions of Plaintiff's functional limitations as of that date. These instances relate to attention and concentration and twitching. Notably, none of them relate to opinions regarding Plaintiff's mobility.

In her 2013 opinion, the ALJ discussed the May 2011 consultative examination by Dr. Ogisu and gave his functional assessment "significant weight." Tr. 21. In the 2017 opinion, the ALJ adds to her prior discussion. In the later opinion, she adds that Dr. Ogisu's opinions, which included that Plaintiff could sit at least half of an eight-hour day but less than six hours, and could stand and walk at least half of an eight-hour day but less than six hours and could lift and carry up to twenty pounds occasionally, were supported by examination results indicating generally normal strength, a normal gait, no atrophy, and normal sensation. Tr. 329 (citing Tr. 263-64). She also found that Dr. Ogisu's opinions were supported by his own observation that Plaintiff did not become fatigued during his examination. Tr. 330 (citing Tr. 263). Further, she cited to a handful of chart notes from Oregon Health & Sciences University from 2015 which indicated that Plaintiff was "healthy other than his reported pain and fatigue[,]" and which described him as "well appearing, well nourished and in no acute distress." Tr. 330 (citing Tr. 582, 584, 587, 592).

Then, after discussing Dr. Gandler's opinions and giving them "little weight," the ALJ returned to Dr. Ogisu's findings. Tr. 330. She again mentioned that in his one-time consultative examination, Dr. Ogisu noted that Plaintiff had normal strength, normal gait, no atrophy, and normal sensation. *Id.* She also remarked that Dr. Ogisu noted that Plaintiff did not become fatigued over the course of his examination. *Id.*

The purpose of the ALJ discussing Dr. Ogisu's opinion in the context of Dr. Gandler's opinion is not entirely clear. She does not expressly reject Dr. Gandler's opinion based on Dr. Ogisu's opinion. Her intentions, if she meant to rely on Dr. Ogisu's examination as a reason to give Dr. Gandler's opinion only "little weight," are not well explained. She suggests, but does

not expressly explain, that Dr. Ogisu's opinion is to be credited over Dr. Gandler's opinion because Dr. Ogisu's opinion is supported by examination results showing normal strength, normal gait, no atrophy, and normal sensation, and because Dr. Ogisu noted that Plaintiff did not become fatigued over the course of the examination. Tr. 329, 330. But, without more, these statements do not provide adequate justification for crediting Dr. Ogisu's opinion instead of Dr. Gandler's opinion. *See Garrison*, 759 F.3d at 1012-13 (ALJ who attempts to reject a medical opinion or assign it little weight by "asserting without explanation that another medical opinion is more persuasive," errs).

The ALJ's reasoning is flawed. First, she fails to explain why a single examination showing normal strength, normal gait, no atrophy, and normal sensation is inconsistent with Plaintiff's severe impairment of fibromyalgia and Dr. Gandler's functional limitations. While Plaintiff experiences pain and fatigue, it is not obvious that his impairment would cause him to have muscle atrophy, an unnatural gait, a loss of sensation, or a loss of strength. Second, as Judge Marsh noted in his Opinion, Dr. Ogisu did not reflect the duration of his examination or whether Plaintiff could perform any of the examination activities repeatedly without pain or fatigue. Tr. 415 (citing Tr. 264). And, as Judge Marsh noted, Dr. Ogisu indicated that Plaintiff reported moderate pain. *Id.* (citing Tr. 264). Again, without more, the fact that Plaintiff did not become fatigued during an examination of unknown duration does not undermine Dr. Gandler's functional limitations.

On this record, I cannot conclude that Dr. Ogisu's one-time examination is a basis upon which to reject Dr. Gandler's opinions which are based on a longitudinal history of treating Plaintiff. The ALJ provides an insufficient explanation as to why Dr. Ogisu's medical opinion is

more persuasive than Dr. Gandler's. The ALJ recites certain findings or observations by Dr.

Ogisu but fails to articulate any reasonable basis for why these findings actually contradict Dr.

Gandler's opinions. For these reasons, I find that the ALJ erred in giving "little weight" to Dr.

Gandler's opinions.

## III. VE Testimony

Because I have identified errors that may impact Plaintiff's RFC, I do not address

Plaintiff's remaining argument that when his RFC is considered along with his age, education,

and work experience, the Grids produce a conclusion of "disabled" and that the ALJ erred by

relying on VE testimony.

## IV. Remand for Additional Proceedings

In social security cases, remands may be for additional proceedings or for an award of

benefits. *E.g., Garrison*, 759 F.3d at 1019 (explaining that if "additional proceedings can remedy

defects in the original administrative proceeding, a social security case should be remanded[,]"

but "in appropriate circumstances courts are free to reverse and remand a determination by the

Commissioner with instructions to calculate and award benefits") (internal quotation marks

omitted). To determine which type of remand is appropriate, the Ninth Circuit uses a three-part

test. *Id.* at 1020; *see also Treichler v. Comm'r*, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule

has three steps).

First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence,

whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record

must be fully developed and further administrative proceedings would serve no useful purpose.

*Id.* Third, if the case is remanded and the improperly discredited evidence is credited as true, the

ALJ would be required to find the claimant disabled.  *Id.*  To remand for an award of benefits, each part must be satisfied.  *Id.; see also Treichler*, 775 F.3d at 1101 (when all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule" of remanding to the agency).

Here, the ALJ failed to provide legally sufficient reasons to reject Dr. Gandler's opinions and Plaintiff's subjective limitations testimony.  As to the second factor, Judge Marsh determined that outstanding issues remained and thus, remand for additional proceedings was appropriate. Tr. 427.  He noted, "most critically," that there was a serious question as to whether Plaintiff was disabled from his alleged onset date of November 28, 2006 given Plaintiff's activities in 2006 and the sixteen-month gap in treatment from February 2007 to June 2008.  *Id.*  Judge Marsh observed that Dr. Gandler himself opined that Plaintiff's symptoms did not become severe until November 2010, four years after the alleged onset date.  Judge Marsh also noted that Dr. Gandler's opinions were not wholly supported by his own treatment notes and that Dr. Ogisu's one-time examination assessed greater physical capabilities than Dr. Gandler.  *Id.*  Thus, he concluded that viewing the record as a whole, there were serious doubts as to whether Plaintiff had been disabled since November 2006 and there were outstanding issues that required resolution before a disability determination could be made.  *Id.*

In the current litigation, Plaintiff argues that a remand for benefits beginning November 2010 is appropriate because there are no outstanding issues regarding his disability determination after that date.  Then, when Dr. Gandler's opinions and Plaintiff's testimony are credited as true, the record conclusively establishes, even based on the VE testimony as opposed to the Grids, that Plaintiff would be found disabled.

I agree with Plaintiff. The only unresolved issues regarding Plaintiff's impairments *after November 2010* arise out of Dr. Gandler's treatment notes, which do not support a limitation on attention or concentration or a limitation based on twitching, and Dr. Ogisu's less restrictive functional limitations. However, as to the treatment notes, the functional limitations which take Plaintiff out of the competitive job market do not relate to attention or concentration or twitching. Dr. Gandler, in addition to his other functional limitations, opined that Plaintiff would be absent from work more than three days per month. Tr. 281-83. This was based primarily on Plaintiff's pain and the fact that he experiences flares which exacerbate his symptoms. *Id.* During the hearing, the VE testified that an individual who missed more than two days per month of work would not be able to engage in competitive employment. Tr. 365. Thus, there are no outstanding issues in regard to reconsidering Dr. Gandler's opinions after November 2010.

As to Dr. Ogisu, the ALJ has twice discussed his contrary opinion and twice failed to sufficiently explain why it should be credited over that of Dr. Gandler. Moreover, as explained above, the fact that Dr. Ogisu found Plaintiff to have normal gait, strength, and sensation, as well as no atrophy, is not inconsistent with a disabling level of impairment caused by fibromyalgia. That Plaintiff did not show fatigue, but did complain of moderate pain, during an examination of undefined length is also not inconsistent with a disabling level of impairment.

Overall, when the entire record from November 2010 on is reviewed, the record does not contain serious doubts about Plaintiff's disability. Moreover, given that this case has previously been remanded and the ALJ has now erred twice, any further delay would be inconsistent with the purpose of the Social Security Act. *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001) ("in cases in which it is evident from the record that benefits should be awarded,

remanding for further proceedings would needlessly delay effectuating the primary purpose of the Social Security Act, to give financial assistance to disabled persons because they are without the ability to sustain themselves.") (internal quotation marks omitted).

CONCLUSION

The Commissioner's decision is reversed and this case is remanded for a determination of benefits beginning November 1, 2010.

IT IS SO ORDERED.

Dated this __15__ day of __November__, 2019

Marco A. Hernandez
United States District Judge